TALIAFERRO, Judge.
Plaintiff sued to recover workmen’s compensation on the basis of permanent total disability to perform work of any reasonable character, the alleged result of an accident while in the discharge of his duties to his employer, J. Rush Wimberly, doing business as Wimberly Construction Company. Admittedly, the accident caused serious and disabling injuries of the character alleged upon. Said employer and its insurer, Coal Operators Casualty Company of Greensburg, Pennsylvania, are made defendants.
Defendants, while admitting the accident alleged upon, and that it produced total disability from date thereof, November 9, 1949, until April 17, 1950, when plaintiff resumed work, alleged that he had fully recovered his former physical ability to' work and, therefore, was not entitled to compensation in excess of the amount previously paid him, $677.16, being for a period slightly in excess of twenty-two (22) weeks. They also alleged, a fact not disputed, that they had paid $500 on account of medical aid and hospital treatment rendered plaintiff.
Plaintiff prevailed below, and from judgment in his favor, defendants appealed to this Court.
Pursuant to LSA-RS 13:5151 and 13:-5152, a pre-trial conference was directed by *815 the Court and held. As a result many facts, some of which were not really in dispute, were definitely stipulated by the parties, which materially reduced the size of the note of evidence.
At the time of the accident, plaintiff was operating or driving a very heavy piece of machinery called a “bulldozer”, used to excavate and remove dirt, push over trees, etc. in the process of clearing or leveling land. A tree being forcefully pushed by the machine, in some manner, rebounded and fell across the machine and upon plaintiff. He was pinned against the seat and temporarily knocked unconscious. On regaining consciousness, he was able to so manipulate the mechanism that the tree was lifted from it. He then crawled to the nearest highway and was there picked up by a passing motorist, who carried him to a hospital in Homer, Louisiana, where he was examined and treated by Dr. S. A. Tatum. The left side of his chest was crushed out of shape. The left lung was in a collapsed state, and was pushing the heart toward the right side; the pleural cavity was aspirated and contained blood. A needle was inserted in the left side to withdraw air and blood, which materially relieved the shortness of breath and pain of which he was then complaining. X-ray pictures made of the chest revealed that two ribs were fractured. Appropriate treatment was administered over a period of some four weeks, including five transfusions. The injuries were considered very serious, and over the first three or four days, doubt was entertained that he would recover. The ribs healed satisfactorily. He was discharged from the hospital on December 7th, but was seen by Dr. Tatum for check-up and examination twenty-five or thirty times thereafter. The doctor was asked if he ever discharged plaintiff as being able to return to work, to- which he answered : "The best I remember, I told him to go back to work and try working; we first had him run around and play a little basketball, trying to get his lungs expanded and his chest back to normal, and he improved as time went along, and we decided to let him try to work; and I told him he could try it and see how he came out and report back from time to time.”
From time to time Dr. Tatum made written reports to the insurer about the progress of plaintiff’s recovery, the last one being on March 2, 1950, since which date plaintiff reported to his office eight or ten times, “to get his complaint and see how he was improving”. Visits were made monthly, 'save for once when two months passed. He was last seen in the office by Dr. Tatum on Saturday prior to the trial on December 18, 1950. The doctor also gave the following testimony, to-wit:
“Q'. Do you or do you not think that you are acquainted with his physical condition, and were through this period of time ? A. I think I am.
“Q. If this patient were submitted to you for oil field work, as roughnecking, what would be-your finding, based on your knowledge? A. Knowing what I know about him ?
“Q. Yes. A. Well, I would do as I have done before. I would let him try it, and if he felt like be could do it, and was willing to work under any handicaps he might have, I would let him go on and work.
“Q. What would be your advice to him as an individual? A. Well, I wouldn’t advise him to do oil field work. Like I told him at the time, I did not advise him to do it, but if he wanted to go on and do it and he felt like he could, and wanted to try it, it would be all right with me.”
On April 17th plaintiff again reported for duty "with defendant, his former employer, and resumed his former line of heavy work, which was performed satisfactorily until May 26th, when he voluntarily quit. " 1
When injured plaintiff was being paid one dollar per hour. He was primarily hired as a bulldozer operator but at times drove trucks and performed such other work as he was directed to do and as need therefor arose.
After the lapse of a brief time following May 26th, plaintiff secured work with the J. I. Roberts Drilling Company as a roughneck at $1.40 per hour, making eight hours per day, seven days a week, with a statutory increase ■ for over time. He admits that under this hiring his wages average *816 more than $100 per week, and he has done this sort of work with the company continuously to date of trial, or for over six months.
At date of trial plaintiff was twenty years old, six feet four inches high, and weighed 205 pounds. His health prior to this accident had been almost perfect. He has not married and was reared on a farm. He alleged and testified that his back and chest gave pain and discomfort continuously and that “petitioner finds it necessary to work in order to earn a livelihood and attempt to repay the debts incurred as a result of his injuries”, yet he admits, notwithstanding the very large wage paid him, he has not paid one penny tO‘ the hospital, in which he was a patient for nearly a month, nor to Dr. Tatum, and not even to the nurse who attended him while a patient in the hospital. When not employed, and when employed near Arcadia, Louisiana, he lives free of charge with his parents.
Sensing that plaintiff was not sincere in his profession of disabling pain and discomfort defendants arranged with the Pen-dleton Detective Agency in Shreveport, Louisiana, to observe him, keep him under surveillance, and to make pictures of him while performing the duties of roughneck. Without his knowledge of the reason for their presence, two representatives of the ágency parked their car close to the locale of plaintiff’s work for periods on October 24t'h, 25th, 26th, 27th and 28th. These observations and pictures were made between the hour of 3 :30 o'clock P. M. and dark, as plaintiff’s shift went on duty at that hour. The machine would not function well after dark. The films were developed and projected in Court below, and in this Court at time of.argument. They clearly reflect that plaintiff, whose duties require that he be on and about the floor of drilling rigs, moved about, climbed ladders or steps, jumped from floor to the ground, lifted and handled heavy objects, dug with a shovel, etc. in a manner that negatived discomfort from pain; in fact, apparently, he did so as efficiently as he could have done had he never been injured. The detective agents supported the disclosures of the pictures above related with their own testimony.
From April 17th to May 26th, while working for Wimberly, plaintiff admits that he did not to1 his superiors complain of any pain or discomfort, but did say he made such complaints to fellow workmen, C. M. Woodard and J. S. Skains. He is flatly contradicted by Woodard, who testified that he performed his duties of driver of trucks and a bulldozer as efficiently as he had previously done, and never at any time mentioned to him that he worked with pain. It was stipulated that if Skains were present, he would testify as did Woodard that plaintiff never mentioned to him that he pained and was uncomfortable while working; in fact, it is stipulated that Skains would testify that he is not personally acquainted with plaintiff.
The comparative heaviness of the duties of a bulldozer operator and those of a roughneck was given considerable attention throughout the case. It is shown that both jobs require, for their execution, no special skill, but do require considerable physical strength. It is not necessary that one be specially schooled or drilled to become efficient in either of these employments. Uneducated persons of both races acquire proficiency therein simply by observing others while so working, followed by practical experience.
Plaintiff testified that the work required of him as roughneck was made lighter because of the generous attitude of his foreman, -an old acquaintance of his father; that is, since the foreman knew his father so well, plaintiff, was specially favored by the foreman by allotting to him light work. It so happened, however, that while the trial was in progress the witnesses were under rule, including his father, and while testifying, without knowledge of that given by plaintiff on this subject, the father stated that he was not even acquainted with plaintiff’s foreman, and did not know his name. Plaintiff testified that one Norman was his foreman, or driller, but his father testified that Norman was not his driller, but someone else he did not even know.
Plaintiff’s father, as a witness in his behalf, testified unequivocably that in his sleep “he made an awful fuss, his lungs, and he would have spells when he would sit *817 down and couldn’t get up for say ten or fifteen minutes at a time, with his back”; that these spells occurred three times per week, or about; but admits that the son has not been at his home all the time, although he has seen him overwhelmed by the spells half a dozen times. Surely this witness referred to plaintiffs physical condition, his pain and discomfort, while recovering from the original injuries. Plaintiff, himself, did not allege nor testify as did his father on this score. And, certainly, the fact that he has been able to do heavy work continuously since May 26th is eloquent evidence in contradiction of his father’s testimony if he intended to ascribe such condition to the period since May 26th.
We think Dr. Tatum’s testimony quite fair and significant. In substance, it is that a man’s ability to work after being given long and efficient treatment for serious, though curable injuries, 'may be best determined by himself by trial; and that after such trial if he feels able to persist in the work, and does so, that fact proves his ability in that respect far better than could the opinion of any physician.
Other eminent physicians, including orthopedic surgeons, are clear in the opinion that the injured ribs healed satisfactorily, and that the collapsed lung has regained normal functioning; and for these reasons they are unable to perceive any clinical condition that supports plaintiff’s profession of disabling pain and discomfort. It is well to iterate that he is only twenty years old, tall, weighty, and presents the appearance of being a giant in strength.
Regretfully, we have to chronicle the several instances in which plaintiff’s testimony on material points has been proven to be untrue. This, perforce, weakens, if it does not impeach, his credibility as a witness in his own behalf.
Our appraisement of the testimony, as a whole, leads inescapably to the conclusion that plaintiff has not proven by a fair preponderance thereof the essential allegation of his petition, viz.: Inability to operate a bulldozer without serious pain and discomfort. However, had he done so we do not believe him entitled to judgment in view of the uncontroverted facts of the case.
Plaintiff’s case is pitched upon the proposition that he is not able to perform the duties of bulldozer operator, “nor work of similar character”.
While courts uniformly construe facts (and the law) favorably toward the injured claimant in compensation cases, by the same token the term work of a “similar character” should likewise be construed to the end that injustice be not done and that schemes to defraud be frustrated. And, especially should this rule prevail in cases wherein special skill and training do not play a pivotal part. Crawford v. Maryland Casualty Co., La.App., 39 So.2d 102.
Plaintiff began public work early in life. According to his testimony he first worked out of Atlanta, Georgia, three years as tractor driver for a telephone company, at $50 per week. The job ceased. He then returned to Louisiana and entered the employ of Crow Drilling Company as roughneck, at $1.40 per hour, and thereafter procured employment with the defendant, Wimberly Construction Company, where his duties were mainly, but not exclusively, to operate a bulldozer. It-clearly appears from the evidence that his ability to earn a livelihood is not confined to any one kind of labor. He is shown bo be a competent operator of tractors, trucks, bulldozers, and likewise competent to do the duties of a roughneck in oil fields, for which he is paid wages far in excess of those paid him as bulldozer operator.
In view of the related facts, we conclude, for all practicable purposes, and as meeting-the pertinent doctrine, that the duties of a bulldozer operator are similar in character to those of a roughneck.
There is a well established line of decisions, beginning, we believe, with Barr v. Davis Lumber Co., Ltd., 183 La. 1013, 165 So. 185; Id., La.App., 161 So. 664, which holds: “Main object of Employers’ Liability Act was to provide an employee, whose wages were discontinued because of injury sustained while serving master, with *818 funds to subsist on until he could return to work (Act No. 242 of 1928 [LSA:RS 23:1021, 23:1201 et seq.] ).”
Reaffirming this principle, are: Brownfield v. Southern Amusement Co., Inc., 196 La. 73, 198 So. 656; Puchner v. Employers’ Liability Assurance Corporation, 198 La. 921, 5 So.2d 288; Atchison v. May, La.App. 5 So.2d 182, Id., 201 La. 1003, 10 So.2d 785; Langston v. Hanbury, La.App., 11 So.2d 415; Daigle v. Higgins Industries Inc., La.App., 29 So.2d 374.
So the present.case falls squarely within the principle announced in these decisions. Plaintiff was paid compensation during the time he was ' physically unable to work. He thereafter returned to work and performed his duties satisfactorily to his former employer. He continued to so work for some six weeks and voluntarily quit; and, we are convinced he did so solely because better wages were obtainable in another job, the duties of which he was well able to and has continuously performed.
The learned trial judge supports his judgment with lengthy written reasons. Regretfully, we find ourselves unable to concur in them.
For the reasons herein given, the judgment from winch appealed, is reversed and the suit dismissed at plaintiff’s cost.